IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JULY 1999 SESSION



**FILED**

September 9, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 01C01-9805-CR-00215 |
| | ) | |
| | ) | Davidson County |
| v. | ) | |
| | ) | Honorable Seth Norman, Judge |
| | ) | |
| COREY LAMAR CAMPBELL | ) | (Second degree murder) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

Dale M. Quillen
95 White Bridge Road, Suite 208
Nashville, TN 37205

For the Appellee:

Paul G. Summers
Attorney General of Tennessee
      and
Marvin E. Clements, Jr.
Assistant Attorney General of Tennessee
425 Fifth Avenue North
Nashville, TN 37243

Victor S. Johnson, III
District Attorney General
      and
James Milam
Assistant District Attorney General
Washington Square, Suite 500
222 2nd Avenue North
Nashville, TN 37201-1649

OPINION FILED:_____

REVERSED AND REMANDED

Joseph M. Tipton
Judge

## O P I N I O N

The defendant, Corey Lamar Campbell, appeals as of right from his conviction by a jury in the Davidson County Criminal Court for second degree murder, a Class A felony. He was sentenced to twenty years confinement in the Department of Correction. On appeal, the defendant contends that (1) the evidence is insufficient to support the conviction, and (2) the trial court erred by not charging the jury with the lesser offense of voluntary manslaughter. Because the trial court failed to instruct the jury on voluntary manslaughter, we must reverse the conviction and remand the case to the trial court for a new trial.

The defendant was prosecuted for the first degree premeditated murder of Kenneth Frierson. At trial, Maureen Boyd testified that she was the victim's girlfriend and that on March 24, 1996, she and her autistic daughter, Lisa, were riding around town with the victim. She said the victim stopped at the defendant's house to talk with the defendant. She said the victim and defendant were friends. She said they stopped in front of the defendant's house, and the defendant eventually came out and greeted the victim. She said the two did not seem happy to see each other. She said the defendant and victim had a short conversation.

Ms. Boyd testified that when she and the victim were ready to leave, she noticed that Lisa's door in the back of the car was open. She said that when she asked the defendant to close the door, the victim became angry, and she and the victim scuffled over the keys. She said she tried to get out of the car, and the victim tried to keep her in. She said their argument lasted about three minutes, and they were yelling and hitting each other. She said that when she got out of the car, the victim also got out and pushed the defendant out of his way. She said the victim chased her and got her back into the car. She said the defendant then headed toward his house. She said

2

the victim asked the defendant if he was going to call the police, but the defendant did not respond. She stated that the victim got back into the car, drove to the end of the street and turned around. She said she pulled the key out of the ignition, cutting off the car. She said she left the car, and the victim pursued her to get her back in the car. She said she then looked up and saw the defendant approaching the victim. She said the defendant had a gun in his hand, and the victim's back was toward the defendant. She said the victim turned around, threw his hands up and said, "Corey, man, what's up man?" She said the defendant was only a few steps away from the victim, and he shot the victim. She said the victim fell to the ground, and the defendant walked up to the victim and shot him again in the temple. She said the defendant said, "That's what you get for disrespecting me." She said the defendant then turned around and went inside his house.

Ms. Boyd identified photographs of her watch and the victim's gold necklace that were found lying in the street, but she said she did not know how they got there. She denied asking the defendant for help during her altercation with the victim. She said she did not believe that she was in danger from the victim. She said the victim did not have a weapon and did not take aggressive or threatening action toward the defendant.

Ms. Boyd stated that the victim pushed her during their scuffle, but she denied that the victim pushed or hit Lisa. She said that Lisa tried to intervene during the argument and that the victim put up his arm to keep Lisa from approaching. She said the victim hit her with his hand. She testified that she is five feet tall and weighs ninety-five pounds. She said the victim was six feet tall and weighed one hundred sixty-five pounds. She testified that when the victim got out of the car during the first altercation, he pushed the defendant and said, "Do you want some of these?" She said

3

she did not have any scratches or marks from her altercation with the victim, only a torn shirt. She said the victim was upset and was in a rage.

Ms. Boyd testified that both she and the victim had been drinking that day. She admitted that the victim used the word "bitch" during their argument. She admitted that she hesitated on direct examination when she was asked whether she was afraid of the victim. She stated that she was not scared because the victim would not have killed her while Lisa was present. She admitted that during the second altercation after she got the keys from the victim and as the defendant was approaching, the victim turned around and took two steps toward the defendant.

Detective Kent McAllister testified that he recovered a gun from the defendant's father, Bernard Campbell. He said that when he asked Mr. Campbell where he got the gun, Mr. Campbell took him behind the house. Detective McAllister testified that he spoke with Ms. Boyd at the scene for about fifteen minutes and that he did not recall seeing any injuries on her. He also stated that he did not remember Ms. Boyd's clothes being torn.

Officer Steve Wiley testified that he arrested the defendant at the scene. He said the defendant stated that the victim came into his yard and disrespected him and that he shot the victim in self-defense. Officer Wiley said the defendant stated that he was sorry and did not mean to do it. He said the defendant told him that the gun had been dropped and someone had picked it up and taken it. He said the defendant told him that he was afraid of the victim and that he had shot the victim after fighting with him. He said the defendant told him that he and the victim argued and that the defendant left to get a gun. He admitted that he did not put this in his report.

4

Dr. Bruce Levy, the Chief Medical Examiner for Davidson County, testified that he reviewed the victim's autopsy report that was prepared by Dr. Mizell, the former medical examiner. He said that Dr. Mizell performed the autopsy. He said the cause of death was two gunshot wounds, one to the head and one to the chest. He said that the bullet entered the head at the right temple and that the range of fire was six to twenty-four inches. He said the bullet exited the left cheek area. He said the range of fire for the chest injury was more than two feet. He said the bullet to the chest went through he breastbone, perforated the blood vessel that transports blood from the head and upper chest to the heart, and perforated the lung. He said the injury would have caused severe bleeding. He said the bullet to the head went through the skull, struck the brain, and exited through the face.

Dr. Levy testified that the victim was six feet tall and weighed one hundred and sixty-six pounds. He said the victim had fresh abrasions and contusions on his abdomen, chest and back that could be consistent with having been in a fight before the gunshot wounds were inflicted. He said the victim's blood alcohol content was .24 percent. He said he also detected the presence of .1 microgram of cocaine, which is a very small amount. He testified that the combination of alcohol and cocaine can lead to explosive and dangerous behavior and could cause one to go into a rage.

Delores Custer testified that she attended a baby shower at the house next to the defendant's house on the day in question. She testified that as she was walking down the street, she saw a car stopped with a man and woman inside. She said the woman was holding something and would not give it to the man, and she said the man hit the woman. She said the man got out of the car, went to the passenger side and hit the woman again with his fists. She said the woman had her hands up during the fight. She said the defendant then came outside and yelled, "Take that out from in front of my house." She said the man turned around and yelled something back

to the defendant. She said they then started walking toward each other, and the defendant pointed a gun at the man. Ms. Custer said she ran and heard gunshots. She said she never saw anything in the man's hands.

The defendant testified that he lived with his parents at the time of the shooting. He said he knew the victim from high school and had dated Ms. Boyd's daughter. He said that on March 24, he went outside to prepare to wash his girlfriend's car. He said he was sweeping the garage when a friend told him that the victim was in his front driveway. He said he finished sweeping the garage then walked out to the victim's car. He stated that he and victim made small talk and that when the victim got ready to leave, Ms. Boyd asked the defendant to shut the back door. He said he complied, but the victim became angry and told Ms. Boyd, "Don't you be asking Corey to do a damn thing." He said the victim began hitting Ms. Boyd with his fists. He said he told the victim to stop, but the victim would not. He said the victim pushed Lisa. He said he told the victim to leave, and the victim started the car. He said he thought they were finished, and he went to wash his girlfriend's car.

The defendant testified that the victim made a U-turn and drove back up the street. He said he saw the victim beating Ms. Boyd hard, and Ms. Boyd yelled for the defendant to help her. He said he told the victim to quit, but the victim said, "Man you want some?" He said the victim continued to beat Ms. Boyd and pulled Ms. Boyd's shirt over her head. He said the victim then took a couple of swings at him. He said he then went to the garage to get a tire tool to scare off the victim. He stated that as he was walking toward the victim, a friend, Greg Brooks, handed the defendant a gun. He said he dropped the tire tool and took the gun, but he did not know if the gun was loaded. He said he tried to break up the fight between the victim and Ms. Boyd, and the victim swung at him. He said the victim said, "Motherf***er, I can't believe you pulled a gun out on me . . . motherf***er, I'm going to kill you." He said the victim charged

6

toward him, and he shot the victim. He said the victim looked wild, and he thought the victim might kill him. The defendant said he did not remember firing the second shot.

The defendant testified that he told the police that he did not know where the gun was because he was afraid. He said he did not know if the victim had anything in his hand when the victim charged toward him. He said that he was trying to help Ms. Boyd and to defend himself. He said Ms. Boyd was bruised and had a bloody nose. He testified that he is six feet tall and weighs one hundred fifty pounds.

Officer Tommy Elder of the Nashville Police Department testified that he arrived at the scene around 4:30 p.m. He said he found a tire tool lying in the grass at the scene. He said the tire tool was approximately twelve feet, ten inches from the edge of the curb.

First, the defendant contends that the evidence is insufficient to support a conviction for second degree murder. He contends that the state did not prove that the killing was knowing, and he argues that he did not know the gun was loaded and was not reasonably certain that his conduct would cause the victim's death. The state contends that the evidence is sufficient. We agree.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

7

Second degree murder is defined as the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). Tenn. Code Ann. § 39-13-302(b) provides as follows:

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

The evidence shows that after witnessing the argument between the victim and Ms. Boyd, the defendant went to his garage to get a tire tool. On his way toward the victim, he dropped the tire tool and took a gun. He walked toward the unarmed victim and shot him once in the chest. The defendant then shot the victim again in the temple at close range. The evidence is sufficient to support a finding that the defendant acted knowingly.

Next, the defendant contends that the trial court erred by refusing to charge the lesser offense of voluntary manslaughter as requested by the defendant. He contends that the evidence shows that he was afraid of the victim, that the victim had swung at him twice and pushed him, and that he only shot the victim after the victim moved toward him in a threatening manner. The state contends that because no evidence of passion exists, the trial court was not required to charge voluntary manslaughter.

Pursuant to Tenn. Code Ann. § 40-18-110(a), a trial court is required "to charge the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so." When the evidence introduced by either party is susceptible of inferring guilt of a lesser offense, the trial court has a mandatory duty to charge such lesser offense. See Tenn. Code Ann. § 40-18-110(a); Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975). An instruction is not required if the record contains no evidence to support a conviction for the lesser offense. State v.

8

Trusty, 919 S.W.2d 305, 311 (Tenn. 1996).  However, "the trial court must consider the evidence in the light most favorable to the existence of the lesser included offense and if the evidence so considered permits an inference of guilt of a lesser offense, the trial court must give instructions as to that lesser offense."  State v. Brooks, 909 S.W.2d 854, 861 (Tenn. Crim. App. 1996).

Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner."  Tenn. Code Ann. § 39-13-211(a).  The defendant testified that the victim swung at him several times and that as he walked toward the victim to break up the fight, the victim threatened to kill him and charged toward him.  The defendant testified that he was afraid of the victim and feared that the victim would kill him.  Ms. Boyd testified that she and the victim were arguing and that the victim was hitting her.  She testified that the victim pushed the defendant at one point and that the victim took two steps toward the defendant before the defendant shot him.  Delores Custer testified that the victim yelled something at the defendant when the defendant asked him to leave and that the two were walking toward each other before the shooting.

We believe that the evidence sufficiently raises the issue of passion upon adequate provocation.  See State v. Bullington, 532 S.W.2d 556, 559-60 (Tenn. 1976); Capps v. State, 478 S.W.2d 905, 907 (Tenn. Crim. App. 1972) (holding that passion is an emotional state which includes fear, terror, excitement or nervousness)(overruled on other grounds, State v. Brown, 836 S.W.2d 530 (Tenn. 1992)).  Thus, the trial court erred by not instructing the jury on voluntary manslaughter.  We further hold that the error in the present case constitutes reversible error, whether viewed under Rule 36(b), T.R.A.P., and Rule 52(a), Tenn R. Crim. P., or under the constitutional standard of harmless beyond a reasonable doubt.  See State v. Williams, 997 S.W.2d 101, 106

(Tenn. 1998). It is significant that the jury acquitted the defendant of first degree murder and convicted him of the lowest offense of which the jury was aware, second degree murder. The defendant was entitled to have the jury consider the evidence as it related to both second degree murder and voluntary manslaughter.

In consideration of the foregoing and the record as a whole, we reverse and remand this case to the trial court for a new trial.

_____
Joseph M. Tipton, Judge

CONCUR:

_____
James Curwood Witt, Jr., Judge

_____
John Everett Williams, Judge

10